Richard ROEMHILD, Plaintiff,

v.

Dr. Grey JONES and Bull Sprig Hunting
Club, Inc., Defendants.

No. 2855.

United States District Court
E. D. Arkansas, W. D.

Dec. 9, 1959.

D. D. Panich, Little Rock, Ark., John Moncrief, Stuttgart, Ark., for plaintiff.

William Moorhead, Stuttgart, Ark., for defendants.

HENLEY, Chief Judge.

This is an action brought by the plaintiff, Richard Roemhild, a citizen of Arkansas, against Dr. Grey Jones, a citizen of Missouri, and Bull Sprig Hunting Club, Inc., a Missouri corporation, to recover 320 acres of land in Arkansas County, Arkansas, described as the East One Half of Section Four, Township Three South, Range Six West.[1] The case has been tried to the Court, and the Court being well and sufficiently advised files this memorandum opinion, incorporating herein its findings of fact and conclusions of law.

On July 12, 1945, the plaintiff, having some title to the above described lands, executed a quitclaim deed covering the same in favor of the defendant, Dr. Grey Jones, said lands to be used as a duck hunting preserve. The consideration for this deed was $1,300. The deed reserved to the grantor "the right * * * to use the water from the ditch bordering said land and which the Grantee covenants to construct on the outside of a levee which he proposes to erect around portions of said tract of land." The deed also reserved to the Grantor "the first right to repurchase said land from the Grantee if he should at any time offer same for sale, at the same price and amount Grantee is now paying for same,

[1]. At the time the action was commenced the federal courts had jurisdiction in diversity cases where the amount in controversy exceeded $3,000, exclusive of interest and costs. The land here involved was worth more than that sum.

and the Grantee by acceptance of this deed agrees to and binds himself to such reservation." This instrument was duly filed for record in Arkansas County on August 6, 1945, and was recorded the following day.

On May 16, 1951, almost six years after the deed from the plaintiff was executed, Dr. Grey Jones and his wife executed a quitclaim deed to the same land in favor of Bull Sprig Hunting Club, Inc. This deed was filed for record on June 22, 1951, and was recorded the following day. Recited consideration was One Dollar, but the instrument has attached thereto federal documentary stamps in the amount of $4.40, which the plaintiff contends indicates that Dr. Jones received from the Club at least $4,-000 as consideration for the deed.

It is the theory of the plaintiff that the conveyance by Dr. Jones to the Club for an alleged consideration of at least $4,000 without first offering the property back to plaintiff for $1,300 was a breach of plaintiff's option to repurchase, and he prays that said provision of his deed be specifically enforced. He has paid into the Registry of the Court the $1,300 which represents the amount he received originally from Dr. Jones. Plaintiff further contends that there has been a breach of the agreement to construct a ditch and to permit him to use the water therefrom. He asserts that the obligation just mentioned was part of the moving consideration for his execution of the original deed, and urges that on account of the alleged breach thereof he is entitled to rescission.

Defendants deny that the transfer of the property from Dr. Jones to the Club was a sale in violation of the option to repurchase, and they contend that the option is void both as a violation of the rule against perpetuities and as an invalid restraint on alienation. They deny that there has been any breach of the water-use proviso, set forth in the deed; and with respect to both of plaintiff's theories they assert that plaintiff is barred by limitations and laches from maintaining this action.

In support of their contention that the transfer of the property from Dr. Jones to the Club was not a sale or an offering of the property for sale so as to make operative plaintiff's option to repurchase, defendants take the position that at the time the quitclaim deed was taken from the plaintiff, Dr. Jones was acting not only for himself but also for a small group of friends, all but two of whom were doctors residing in the vicinity of St. Louis; that the property was acquired for the use and enjoyment of this group, which fact was well known to plaintiff when he conveyed the land; that the group called itself the "Bull Sprig Hunting Club," and that subsequently a formal unincorporated association bearing that name was formed; that still later the unincorporated association was succeeded by the corporate defendant; and that the stockholders in the corporation, with certain exceptions, are the members of the original informal group and the later unincorporated association. From these premises defendants argue that the 1951 conveyance from Dr. Jones to the corporate defendant was not a sale to any outside interest, but was a mere transfer of legal title from the holder thereof to the equitable owner of the premises; and in this connection they deny that Dr. Jones was paid any cash consideration for his deed to the Club, although they concede that he received stock in the Club in proportion to his original contributions to the venture.

With regard to the alleged breach of the water-use proviso, defendants deny that Dr. Jones ever agreed with the plaintiff that a ditch of any particular type would be dug, or that it would be located along any particular line; and they contend that ditches have been dug on the property and that plaintiff has never been denied the use of water therefrom. In addition, defendants claim that they completed the building of levees and ditches on the property not later than 1946, that plaintiff knew where those ditches and levees were located, and that

he stood idly by for eight years without making complaint or taking any action.

At the trial of the case the plaintiff called as a witness Mr. Thomas Strode, the County Surveyor of Arkansas County. Plaintiff also testified in his own behalf and introduced documentary evidence, including a map of the area in controversy and surrounding lands. In support of the contentions of the defendants there was presented to the Court the testimony of Dr. Jones and Dr. Hagebusch, a member of the Club, who was also a member of the original "Bull Sprig" group.[2] Defendants likewise introduced documentary evidence.

Plaintiff testified that he acquired his title to the area in controversy in 1944, that it was uncleared timber land lying to the northwest of certain cleared acreage he owned, and that the northeast corner of the tract fronted on the main line ditch of the Bayou Meto Drainage District. He testified further that he was clearing other land to the south of Section 4, that there was a shortage of water for irrigating rice on the land that was cleared and was being cleared, and that he acquired the area in controversy with the end in view of digging a ditch along the east side thereof so as to be able to pump water from the main line ditch of the drainage district down to his more southerly properties.

According to the testimony of the plaintiff the facts surrounding the conveyance to Dr. Jones are as follows:

On the morning of July 12, 1945, plaintiff was at his farm and was there approached by Dr. Jones, Dr. Hagebusch, and Mr. Otis McCollum, a resident of Stuttgart with whom he was acquainted.[3] Mr. McCollum introduced him to Dr. Jones who said that he, Jones, wished to buy the East Half of Section 4 for duck hunting purposes. Plaintiff then advised Dr. Jones that he did not wish to sell the property, but the doctor importuned him to do so and promised to construct a levee along the east side of the property in such fashion that the resulting borrow pit ditch would give access to the "big ditch" so as to supply plaintiff's need for water. Dr. Jones also promised to reconvey the land to him for the same price he was to receive for it, such conveyance to be made when Dr. Jones should no longer need the land for hunting purposes and was ready to sell it. The plaintiff finally agreed to sell the property for $1,300 plus the promises to dig the ditch and to reconvey. After negotiating, Jones, Hagebusch, and McCollum left the premises. The transaction was completed about 9 or 10 o'clock that night in the law office of the late M. F. Elms, who was Dr. Jones' attorney. Jones, Hagebusch, McCollum, Elms, and the plaintiff were present. Plaintiff signed the deed, but no other document, and received thirteen $100 bills in payment. The plaintiff stated that all of the negotiations were conducted between him and Jones; that he thought he was dealing with Jones personally, and had no idea that Jones was a member of or acting for any group. He swore that he would never have parted with the land except for Dr. Jones' promises to dig the ditch and to reconvey.

When the map that has been mentioned is considered in light of the other evidence in the case, it appears that the land in question corners with the lands which the plaintiff owns in Section 10. The plaintiff owns the Southeast Quarter of Section 9, which lies due west of Section 10, and he owns lands in Section 15 to the south of Section 10, not all of which appear on the map.

Directly east of the area in controversy are lands in Section 3 owned by one Rosencrantz, on which lands the corporate defendant and its unincorporated

---

2. Dr. Hagebusch testified that about the time the group first began to talk about acquiring duck hunting property in Arkansas he had killed a lone bull sprig duck, and that the name of the group stemmed from that episode.

3. At that time McCollum was a member of the Bull Sprig group and later was a member of the unincorporated association. He has never been a stockholder in the corporation.

predecessors have held a lease since 1945 or 1946. The corporate defendant and its predecessors have held and now hold title to the lands adjoining on the west all of the lands owned by the plaintiff, and also hold title to those lands lying immediately to the west of the tract of land conveyed to Dr. Jones.

While no levee or ditch has been constructed along the east side of Section 4, a levee has been constructed. It begins at a hickory ridge in the Southeast Quarter of Section 3 a short distance east of the southwest corner of said quarter section, and runs west to the southeast corner of Section 4. It continues west a very short distance into Section 4, then turns south and runs in Section 9 parallel to the west line of Section 10 to a point near the southeast corner of the Northeast Quarter of Section 9, then runs west to the center of Section 9 where it terminates. There is another levee which commences on the west line of Section 9 a short distance south of the northwest corner of that Section and runs north along the west line of Sections 9 and 4 until it reaches a point near Big Bayou Meto where it turns northeast and so runs until it reaches the north line of said section. It then runs in a southeasterly direction across the extreme northern portion of Section 4 until it intersects the main drainage ditch, to which reference has been made.

The levee first above mentioned was started in the fall of 1945, and all of the leveeing was completed by 1946. The plaintiff admitted that he knew of the existence of the first levee from the time it was built, and in fact he hauled some pipe to be used in connection with the levee construction. Plaintiff stated that he first heard of the "Bull Sprig Club" in 1946, and that no later than 1948 he knew that all of the lands owned and controlled by the Club were being operated as a unit.

Mr. Strode, who made the map, testified that it would have been feasible to have built a levee on the east side of Section 4; that the borrow pit ditch which would have been an incident to

such levee would have afforded the plaintiff access to the main drainage ditch, which usually has ample water in it; and that such ditch would also have afforded drainage to the plaintiff's lands in Section 10. He further testified that the construction of the levee along the north line of Section 10 has not benefited the plaintiff, but has in fact damaged him by impounding water on a portion of his property in the northwest corner of that Section.

In their testimony Dr. Jones and Dr. Hagebusch sharply contradicted the plaintiff as to the negotiations leading up to the execution of the deed and as to the agreements made by the parties. Their testimony may be summarized as follows:

In July 1945, Elmer Grant, who was one of the Arkansas members of the Bull Sprig group, was confined in a hospital in St. Louis. While there he suggested that Dr. Jones go to Stuttgart and seek to acquire title to the lands in question. He told Dr. Jones that he had $1,500 in his lock box in the bank, and he gave Dr. Jones the key to the box and a letter to the bank which would gain admission to the box.

On July 11, 1945, Jones and Hagebusch went to Stuttgart where they met Otis McCollum. They went to the bank, took the money out of Grant's box, and then drove out to the plaintiff's farm. The plaintiff was operating his tractor, and although he saw them, he refused to stop the tractor so as to talk with them.

Jones and his companions had information that Bayo Meto Drainage District held a title to the lands in question by reason of foreclosure of delinquent assessments, and not being able to talk to the plaintiff at the time, they proceeded to Lonoke and arranged to obtain a deed to this property from the District. They also had information that title to the West Half of Section 4 was in the State by reason of tax forfeiture, and in order to acquire that title they went to the State Land Office in Little Rock and made arrangements to obtain a redemption deed. Later they returned to Stutt-

gart where, after dinner, they resumed their efforts to contact the plaintiff. They saw him in his car as he was returning from the farm. They stopped him, and the four men went to Mr. Elms' law office where the negotiations took place. The plaintiff was reluctant to sell, but finally agreed to take $1,300 for the property.

Both Jones and Hagebusch were emphatic in their testimony that plaintiff was told that the lands were being acquired for the Club and that he was apprised of its general membership. They were also emphatic in saying that there was never any agreement to build any levee or ditch along the east side of Section 4, or at any other particular place, and that all that was said about ditches was that the plaintiff would have the privilege of using water out of any ditches that were built. Dr. Jones testified that it was he who suggested that the plaintiff be given the option to repurchase. The doctors further testified that after the negotiations were concluded Mr. Elms prepared a receipt or notation of some kind, not a deed, and that the plaintiff signed it and received his money. Jones stated that he never saw the actual deed until after this suit was filed. The receipt remained in Mr. Elms' possession and appears to have been lost.

Dr. Jones testified that when he and his wife executed the deed to the corporation he received no money, that all of the transactions relative to the formation of the corporation and the turning over to it of the assets of the unincorporated association were handled by the latter's attorney, and that stock in the corporation was issued in proportion to the contributions of the original members of the association. While Dr. Jones was not able to explain the appearance of the documentary stamps on the deed from him to the corporation, it may be fairly inferred that they represented the amount of Dr. Jones' total contribution to the Club, rather than consideration for the conveyance of this particular tract of land.

Mr. Grant corroborated the testimony of Jones and Hagebusch as to the $1,500 coming from his lock box, and stated that said sum was his contribution to the Club.

The deed from Bayou Meto Drainage District covers all of Section 4 and was taken in the name of Otis McCollum. That instrument was dated July 13, 1945, and it has affixed thereto documentary stamps in the amount of fifty-five cents. The deed from the State covers the West Half of Section 4 and recites a consideration of $308.19, representing back taxes, penalty and costs, a confirmation fee, and a fee for the deed itself. That deed also named Otis McCollum as grantee. On June 25, 1946, Otis McCollum and wife executed a quitclaim deed to Dr. Jones covering the East Half of Section 4.

The Articles of Association of Bull Sprig Hunting Club, dated January 16, 1947, show the Club to be the owner of all of Section 4 and of most of Section 9, and reflect that the Club held under lease from Rosencrantz all portions of Sections 2 and 3 lying west of Bayou Meto as well as that part of Section 11 on which a reservoir was situated at the time. The articles constituted Dr. Jones and Elmer Grant trustees of the legal title to all lands owned or leased. Names signed to the articles were those of Dr. Jones, Mr. Grant, Dr. Hagebusch, Mr. McCollum, Dr. W. G. Marston, and Dr. J. R. Roberts.

Drs. Hagebusch and Jones testified that in addition to themselves the present stockholders in Bull Sprig Club, Inc., are Dr. Roberts, a Dr. Knoll, and Mr. Grant. Dr. Marston dropped out of the Club prior to its incorporation, and Dr. Knoll took his place. Thus it may be seen that while there have been changes in the membership of the organization since the formation of the original "Bull Sprig" group, those changes have not been of a nature different from those which would ordinarily be expected in the case of any hunting club or similar organization.

## I.

The option to repurchase upon which plaintiff relies was the subject of consideration by the Court of Appeals in Roemhild v. Jones, 8 Cir., 239 F.2d 492, upon an appeal by the plaintiff from an order entered by this Court on July 6, 1956, dismissing the complaint and amendment thereto for failure to state a claim upon which relief could be granted. The Court of Appeals reversed with directions that this Court consider and determine whether, as a matter of Arkansas law, the option violated the rule against perpetuities and whether it was an unlawful restraint on alienation.[4] The reviewing Court felt that plaintiff's reliance on the water-use proviso, the defenses of limitations and laches, and the question of restraint on alienation, all presented factual issues which should be determined upon a trial.

While the remand was without prejudice to the right of the trial court to determine the validity of the option, the evidence developed at the trial renders such a determination unnecessary because the Court is convinced that the 1951 quitclaim deed from Dr. Jones to the corporate defendant did not constitute a sale of the property, but was merely a transfer of naked legal title, which Dr. Jones had held in trust for himself and the other members of the unincorporated association, to the corporation they formed, of which they were the sole stockholders.

■ In this connection the Court finds, in line with the testimony of Dr. Jones, Dr. Hagebusch, and Mr. Grant, that these lands were purchased for the benefit of the Club, and that the plaintiff was aware of that fact and knew, in general, the identities of the members of the Club. There was nothing personal in the relationship between plaintiff and Dr. Jones which would have prompted the former to convey his lands to the latter while being unwilling to convey them to any one else. Plaintiff had never met Jones prior to the negotiations leading up to the sale, and he did not see him thereafter until the trial of the case fourteen years later and was unable to identify him in the courtroom. While there was no evidence as to the reason for the formation of the corporation, there is nothing to indicate that the motive of the incorporators was to evade or defeat the option in question.

■ In such circumstances, the Court construes the option to mean that plaintiff should have the right to repurchase the property should it be offered for sale to some outside individual or interest for cash or its equivalent, and is of the opinion that it did not include the transfer of title to the property to the corporate defendant, which transfer was without any monetary consideration. Hence, assuming without deciding that the option is valid, it has never become operative, and there has been no breach thereof. This being true, the plaintiff has no right under it, at least at this time, to have the property reconveyed to him. The Court expresses no opinion as to whether such a right will arise if in the future the corporate defendant should undertake to sell the property, or if the stock in the corporation should be so transferred as to bring about a radical change in the membership of the Club.

While we have found no Arkansas case that is directly in point on this phase of the controversy, the Supreme Court of Arkansas has said in other contexts that two of the essential elements of a sale are parties standing in the relative positions of buyer and seller and a price paid or to be paid for the property sold. See Matthews v. Freker, 68 Ark. 190, 196, 57 S.W. 262, and Ward v. State, 45 Ark. 351.

4. See letter opinion dated March 28, 1956, formally made a part of the record January 5, 1957, three days subsequent to the rendition of the decision of the Court of Appeals. Although the record before the Court of Appeals did not disclose the fact, it appears that the basis of this Court's order was its opinion that the option did violate the rule against perpetuities and was an illegal restraint upon alienation.

In the case last cited it is said (at page 353):

"A sale denotes the transfer of the property in a thing, from one to another, for a valuable consideration. This is its popular, as well as its legal, signification. There must be parties standing to each other in the relation of seller and buyer; their minds must assent to the same proposition; and money must be paid or promised. * * *"

Under the facts disclosed by the evidence in the instant case the Court does not feel that it can be fairly said that in any conventional sense Dr. Jones and the Club occupied toward each other the positions of "seller" and "buyer," and no price was paid to Dr. Jones by the Club for the conveyance.

Further support for the conclusion that the transfer of this land from Dr. Jones to the Club was not a sale is to be found in Bartlett v. Slater, 211 Mass. 334, 97 N.E. 991, wherein it was held that a transfer of tangible properties to a corporation organized for the management of those properties, the transferors receiving stock and bonds of the corporation in exchange, was not a "sale" of the properties. A similar result was reached in Halsted v. Globe Indemnity Co., 232 App.Div. 576, 251 N.Y.S. 181.

██ It is argued on behalf of the plaintiff that the parol evidence rule precludes the Court from considering the testimony to the effect that Dr. Jones was purchasing the property for the benefit of others as well as himself, and that this fact was known to the plaintiff. There is no question that the parol evidence rule prevails in Arkansas, and that ordinarily parol evidence is not admissible to vary or contradict the terms of a written instrument, including a deed. There are a number of situations, however, in which the rule does not apply. For example, parol evidence is admissible to show the true consideration for the instrument, or to show that a deed absolute on its face is in fact a mortgage, or to establish a resulting or constructive trust. Likewise, where a contract is

made by an agent acting in its own name for an undisclosed principal, the latter may sue or be sued on the contract, and in such an action may establish his status by parol. See 20 Am.Jur. Evidence, Section 1125.

While this is not a suit to establish or enforce a resulting trust, nor is it a suit brought by or against an undisclosed principal, it bears a strong analogy to actions of that type, and the Court is satisfied that the challenged evidence was admissible. The evidence was not admitted to vary or contradict the terms of either the option to repurchase or the obligation on the part of Dr. Jones to dig the ditch. It was introduced simply to show the nature of the original transaction and to show that the transfer of the legal title to the property was not a sale within the meaning of the option.

### II.

██ Notwithstanding the testimony of Drs. Jones and Hagebusch to the effect that there was never any agreement to construct a levee or dig a ditch in any particular location, which particular testimony may not have been admissible under the parol evidence rule, the Court finds that there was such an obligation. The express stipulation contained in the deed to Dr. Jones refers to a ditch bordering said land, which ditch Dr. Jones "covenants to construct" on the outside of a levee "which he proposes to erect around portions of said tract of land." At the time of the conveyance there was no existing ditch or levee bordering any part of the East Half of Section 4, except the main line drainage ditch which ran across the northeast corner thereof for about a thousand feet, and the only ditch which could have been constructed that would have brought water from the drainage ditch to plaintiff's lands in Section 10 would have been a ditch along the east side of Section 4.

No levee or ditch of any kind has been constructed along that line, nor can it fairly be said that either of the levees that was built extends "around portions" of the land in controversy. The Court

finds, therefore, that the obligation to dig a ditch and permit the plaintiff to take water therefrom has been breached.

On the other hand, the Court is equally convinced that, notwithstanding this breach of obligation, plaintiff is not entitled to any relief in this action on account thereof.

Assuming that the failure to dig the ditch amounted to such a substantial breach of contract as would have justified rescission in the first instance,[5] the Court is of the opinion that plaintiff's claim for that relief, or to any other relief called for by his pleadings, is barred.

The deed from plaintiff to Dr. Jones does not specify any time within which the ditch in question was to be constructed, and for that reason it was the duty of the grantee and his associates to construct the ditch within a reasonable time. Roemhild v. Jones, supra, 239 F.2d at page 498. The fact that plaintiff may not have desired or needed water from the ditch for a period of several years subsequent to the deed is not of controlling importance. His utilization of the ditch for irrigation purposes was dependent upon his installing a pump to conduct water from the main line ditch of the drainage district into the ditch leading to his farm, and he could have delayed this installation for as long as he pleased.

In view of the fact that the levee which was first built was completed by the fall of 1945, and that the second levee was finished by the fall of 1946, it is clear that a reasonable time for completion of a levee and ditch along the east line of Section 4, after making ample allowance for the time consumed in the construction of the levees that actually were built, would have been not later than the fall of 1947, and plaintiff's cause of action accrued at that time if not before. He did not commence his suit, however, until the last of July 1954, and for that reason his action is barred by the Arkansas five year statute of limitations.[6]

Aside from any question of the applicability of the statute of limitations, it is a well settled principle of Arkansas law that a party desiring to rescind a contract must proceed with reasonable diligence after his right to rescind arises and comes to his knowledge, and that a failure on his part to do so amounts to a waiver of that right. Jones v. Gregg, 226 Ark. 595, 293 S.W.2d 545; McCormick v. Daggett, 162 Ark. 16, 257 S.W. 358; Kilgo v. Continental Casualty Co., 140 Ark. 336, 215 S.W. 689, and Fitzhugh v. Davis, 46 Ark. 337. Such waiver may arise from a delay for far less time than the statutory period of limitations. Ibid.

In the application of the principle just stated, it appears to the Court that, when the Bull Sprig group commenced its ditching operations, it was notice to the plaintiff that no levee or ditch was going to be built along the east line of the property conveyed by him, and it behooved him to move then to protect his rights, which he readily could have done. Equity aids the diligent, and the Court does not feel that the plaintiff's long delay in asserting his rights should be countenanced.

5. Although the Court is willing to indulge this assumption for present purposes, its validity is not free from doubt. While the plaintiff insists that he would not have executed the deed had it not contained the water-use proviso, there is no evidence that he has sustained any actual damage on account of not being able to obtain water from the drainage ditch, or that such inability has affected him in his agricultural operations in Sections 10 and 15, or that he could not have readily obtained an equally abundant, and perhaps more reliable, supply of water by the drilling of one or more wells on his property, the cost of which could have been recovered by an action at law for damages.

6. Ark.Stat.1947, Section 37–210, provides that actions on writings under seal shall be commenced within five years after the cause of action shall accrue. The preceding section prescribes a similar period for actions on writings not under seal.

But, regardless of the exact time at which the plaintiff should have known that the water-use proviso had been violated, he certainly knew it by 1948, yet he commenced no action until 1954, and there is no evidence that prior to that time he made any demand that the ditch called for by his contract be constructed, or that he made any inquiry as to the intention of the Club with respect to the ditch. Indeed, it appears from his own testimony that what eventually spurred him to action was not the failure of the Club to dig the ditch, but information that came to him that the property had been conveyed to the corporate defendant, which conveyance he supposed to be a violation of the option to repurchase.

Without desiring to labor the question, but out of a sense of fairness to the plaintiff, it may be added that even if full weight and significance be given to his testimony that he did not anticipate a need for the ditch for five or six years after he sold the property, that period expired in 1951, and he waited three years after that to commence his action. Under the Arkansas cases heretofore cited, that delay was unreasonable and precludes the plaintiff from success in this action.

In conclusion, it is to be observed that cancelling plaintiff's deed and returning the land to him would not restore the status existing before the contract was made. On the contrary, it would be a windfall to the plaintiff in that he would regain title to 320 acres of land right in the middle of the Club's hunting preserve, which, from the Club's standpoint, would be ruinous.

It is, therefore, Considered, Ordered, Adjudged and Decreed that the plaintiff herein take nothing by this action, and that his complaint and the amendment thereto be, and the same hereby are, dismissed with prejudice and at the cost of the plaintiff. The Clerk will return to the plaintiff the $1,300 deposited in the Registry of the Court.