AMOS BARTLETT & others, trustees, *vs.* ESTHER SLATER & others.

Worcester.   March 30, 31, 1911. — March 1, 1912.

Present: RUGG, C. J., MORTON, HAMMOND, LORING, BRALEY, SHELDON, &
DeCOURCY, JJ.

*Trust,* Duties of trustee under compromise agreement.   *Probate Court.   Compromise Agreement.   Equity Pleading and Practice,* Amendment, Report, Decree, Appeal.

A testator by his will left the residue of his estate to trustees, who were the executors named in his will, to accumulate for twenty years and eleven months after his decease, and then to be paid in equal shares to four minor children who survived him and of whom his widow was appointed the guardian.   The residue included extensive mills manufacturing cotton and woollen goods conducted under one management and operated as a whole.   The will authorized the executors to carry on the testator's cotton manufacturing business "for the purpose of winding it up, so long as they find it advisable so to do, to close it up without serious loss . . . and when as executors they shall have wound up said business, they are to pay over the proceeds thereof to themselves as trustees."   By authority of the Probate Court and with the consent of all persons interested all the manufacturing properties and business were conveyed to a corporation formed for the purpose, and the executors held the bonds, preferred stock and common stock of this corporation representing the manufacturing properties.   Later an agreement of compromise, approved by the Probate Court, was made between the executors and trustees and the testator's widow as guardian of the beneficiaries of the trust.   This recited that "Whereas a controversy has arisen between the said guardian and the said executors and trustees respecting their powers and duties as regards the securities" of the corporation, "the continued operation of said mills by the said executors and trustees" and other subjects-matter, "the executors shall transfer to themselves as trustees, all of the securities" of the corporation "which are now held by them as executors, and thereupon their executors' accounts shall, as between all parties in interest, be considered as closed, settled and allowed."   There followed provisions that the trustees as shareholders of the corporation should cause to be elected a board of directors consisting of themselves and the guardian and her counsel and that the trustees as directors should be "subject to no further or other responsibility or liability than that imposed upon directors in similar corporations."   This agreement contained a provision that any party to it might at any time apply for an order and decree for the sale of the securities of the corporation.   There was no appeal from the decree of the Probate Court by which the agreement of compromise was approved.   More than two years later the trustees brought a bill for instructions praying that the court would determine whether the plaintiffs might sell the securities of the corporation and, if so,

upon what terms and conditions. These securities constituted more than half of the trust fund and their estimated value was more than $6,000,000. The trust had existed more than eleven years and would terminate in about nine years. The agreement of compromise had become unworkable. Before the making of that agreement there had been no necessity of borrowing money but since then it had been necessary to borrow large sums of money, the amount of capital needed for the business was increasing constantly and at the time of the filing of the bill it had become necessary soon to invest large sums of new capital for replacement and extension of the plant. The guardian of the beneficiaries objected to a sale of the securities. *Held,* that, assuming that under the agreement of compromise the property should be retained by the trustees until there had been some material change in the situation looking to the contrary, a change had occurred, which had increased the unfitness of the property for trust investment and the impropriety of the carrying on of the business by the trustees, indicating that at least the shares of stock of the corporation both common and preferred should be sold. MORTON & BRALEY, JJ., dissenting.

Where, in a case in which the Probate Court has jurisdiction of the subject matter and of the parties, that court makes a decree approving an agreement of compromise under St. 1907, c. 447, and there is no appeal from the decree, the question whether the Probate Court in approving the agreement rightly interpreted the statute is not open in any further proceedings in that case.

In a suit in equity by the trustees named in a will for instructions as to their duty, under an agreement of compromise approved by the Probate Court, in regard to selling certain securities forming a part of the trust property, a motion made by the defendants to strike out from their answer an admission that the compromise agreement was unworkable here was held to have been denied rightly within the discretion of the single justice who heard the case, and it further was held that the defendants were not harmed by the denial of the motion, because the justice found as a fact, on evidence warranting such a finding, that the agreement had become unworkable. MORTON & BRALEY, JJ., dissenting as to the character of the alleged admission and as to the finding warranted by the evidence.

In a suit in equity by the trustees named in a will for instructions as to their duty, under an agreement of compromise approved by the Probate Court, in regard to selling certain securities forming a part of the trust property, where a petition was pending for the removal of the trustees, it was *held,* that, although the petition for the removal of the trustees might have been heard with the bill for instructions, yet on the facts of the case it was not so closely allied to the question whether the securities in question should be sold as to make the consideration of both at the same time essential for the purposes of justice, and that it could not be said that the single justice who heard the case exercised his discretion wrongly in declining to hear the petition for the removal of the trustees with the bill for instructions; and, irrespective of the personality of the trustees, it was ordered that a sale of at least a part of the property should be made by the trustees for the time being, subject to the approval of a single justice of this court. MORTON & BRALEY, JJ., dissenting.

By the equity practice established under the statutes of this Commonwealth, when a final decree in a suit in equity has been entered formally and an appeal has been taken, the case cannot be reported for determination by this court, and the appeal comes before this court with or without a report under R. L.

c. 159, § 23, by the justice who made the decree, not of the case, but only of the material facts found by him.

In a suit in equity by the trustees named in a will for instructions as to their duty, under an agreement of compromise approved by the Probate Court, in regard to selling certain securities constituting more than half of the trust fund, a decree made by a single justice, authorizing a sale at a fair price but ordering "that the terms of such sale and the adequacy of such price shall be submitted and subject to the approval of a single justice of this court," is not a final decree, and under R. L. c. 159, § 27, may be reported as an interlocutory decree for determination by this court.

In a suit in equity by the trustees named in a will for instructions as to their duty, under an agreement of compromise approved by the Probate Court, in regard to selling certain securities of an estimated value of more than $6,000,000 and constituting more than half of the trust fund, a single justice made an interlocutory decree authorizing a sale by the trustees subject to the approval of the court, and denied a motion of the defendants to restrict the order to the sale of the securities without authorizing the plaintiffs to conduct the sale. He declined to consider charges against the general ability or inclination of the plaintiffs to act as trustees ought to act in such a matter, and found as a fact that none of the trustees had any such personal interest in the proposed sale of the securities as disqualified him from acting loyally and to the best of his ability for the trust in making the sale. *Held,* that it did not appear that the justice exercised his discretion wrongly in denying the motion. MORTON & BRALEY, JJ., dissenting.

In a suit in equity by the trustees named in a will for instructions as to their duty, under an agreement of compromise approved by the Probate Court, in regard to selling certain securities of great value constituting more than half of the trust fund, where a single justice makes an interlocutory decree authorizing a sale of the securities subject to the approval of the court, it is right for the justice to deny a motion for the insertion in the decree of a provision to the effect that the price at which the securities shall be sold shall be determined finally and without right of appeal by a decree of a single justice, because a single justice would have no jurisdiction to make a decree either interlocutory or final from which an appeal could not be taken.

HAMMOND, J. This is a bill for instructions * brought by the trustees under the will of Horatio N. Slater, late of Webster in this State, setting forth that as such trustees they hold certain securities and praying that the court will by its decree determine whether the plaintiffs " may sell said securities and if so upon what terms and conditions." It was heard by a single justice † who entered a decree in substance that the securities or a part of them should be sold. He was of opinion that this was a final decree so that it was ripe for entry and hearing in the full

---

* Filed in the Supreme Judicial Court on October 25, 1910.

† *Rugg,* J.

court, but being of opinion that the matters raised were of such importance that in the interest of all parties they ought to be decided before further proceedings, by agreement of the parties he has reported all questions which would be open on an appeal therefrom, and all exceptions so far as material to said decree, for the determination of this court; and the case is before us on this report.

1. The main question is whether the securities or any part of them shall be sold. Mr. Slater died August 12, 1899, leaving a widow, Mabel H. Slater, and as his heirs at law (in addition to his children by his first wife) four minor children, the defendants, the issue of his marriage with the said Mabel. He left an estate amounting to several millions of dollars. At the time of his death he was engaged extensively in the manufacture of cotton and woollen goods in Webster, and had been so engaged for many years. The mills for the manufacture of cotton goods were owned by him in his individual capacity, while the mills for the manufacture of woollen goods belonged to the Slater Woolen Company, a corporation organized under the laws of this State. He owned, however, all but two hundred shares of the five thousand shares into which its capital stock was divided. The business, both cotton and woollen, had long been conducted under one management, and all the manufactured goods were sold by a single agency under the name of S. Slater & Sons. The connection of the cotton and woollen business was such that the parties interested seem to have thought that the value of the business depended upon its continued operation as a whole, and that any dismemberment would be disastrous.

By his will, after various bequests, the testator devised in the fourteenth clause the residue of his estate to trustees to accumulate for twenty years and eleven months after his decease, and then to pay over and convey, share and share alike, "to the children of my marriage with my wife Mabel" the trust fund so accumulated, one half of each child's share on the arrival of such child at the age of twenty-five years, and the remainder on its arrival at the age of thirty years, with provisions for the various contingencies which might arise in the case of the death of any or all of the children with or without issue before arriving at the ages above named, and also in case the period of twenty years

and eleven months should expire before the children should reach such ages respectively. By the fifteenth clause he appointed the present plaintiffs executors and trustees, and made provision for the investment, management and sale of the trust funds, which so far as material to this inquiry will be hereinafter considered. After giving his executors power to sell at public or private sale any part of his estate real or personal not specifically devised, upon such terms and conditions as they should think fit, he gives specific directions as to his manufacturing business in the following language:

"I also authorize and empower my executors to carry on, as executors, in the name of my estate, my manufacturing business, and other business outside of corporations, for the purpose of winding it up, so long as they find it advisable so to do, to close it up without serious loss; and to that end, and that there may be no misapprehension on the part of any person interested in the result of said business, either said executors, beneficiaries under this will, or creditors of said business so conducted after my decease, I hereby declare, and it is my will that my said executors are authorized to risk as capital for the purpose of carrying on said business only such part of my estate as may be invested in said business, at the time of my decease, in the shape of stock raw, wrought and in process and all such creditors are hereby notified that my estate is to be liable to the extent above stated and no more. And when as executors they shall have wound up said business, they are to pay over the proceeds thereof to themselves as trustees, and as trustees hold the property derived from said business in trust, as herein before provided."

Various provisions of the will were not satisfactory to some concerned and there was opposition to its allowance as it stood. Pursuant to a compromise agreement entered into by all parties interested and approved by the Probate Court, the terms of which are here immaterial, the will, as it was then supposed, was proved and allowed by a decree of that court on September 5, 1899, subject to the compromise, and the plaintiffs were appointed executors. Subsequently it was discovered that the Probate Court had no jurisdiction to make such a decree (see *Abbott* v. *Gaskins,* 181 Mass. 501), and by reason of that and other facts another compromise agreement, the terms of which are not here

material, was entered into; and by a decree of a single justice of this court, dated June 17, 1902, the will was finally allowed in accordance therewith, and the plaintiffs were appointed executors and trustees. Previous to the decree of the Probate Court of September 5, 1899, the plaintiffs had been appointed special administrators, and up to September 5 as special administrators, and subsequently, nominally as executors but in reality, as it turned out, still as special administrators, they carried on the business until the decree of June 17, 1902. Subsequently they claimed compensation upon that footing, largely in excess of what the will would have allowed them either as executors or trustees.

In May, 1903, by authority of the Probate Court, the executors, with the consent of all concerned, conveyed to a corporation organized for that purpose under the name of S. Slater & Sons, Incorporated, all the manufacturing properties and business, including their controlling interest in the stock of the Slater Woolen Company, and received in payment therefor and in lieu thereof the bonds, stocks and securities of the new corporation, to wit: Bonds, $1,500,000: Preferred stock, $1,500,000: Common stock, $3,000,000, and a note for surplus assets to the amount of $385,266.59. These are the securities to which the present bill relates.

From the allegations of the bill upon which the decree was made and the terms of the decree itself, it is manifest that this transfer was not a sale within the terms of the will for the purpose of a final winding up of the business, but was merely a change in the method of holding the property to the end that the sale contemplated in the will could be more easily and advantageously made. The testator's direction to the executors to sell was as applicable to these securities received from the corporation as it theretofore had been to the property conveyed to it. From the time of the sale to some time in 1906 the plaintiffs were the sole directors, but in 1906 the board was increased to five by the addition of Mr. Olney and Mrs. Slater, the guardian of the defendants. There was more or less friction however between the executors and the guardian, and in June, 1906, another compromise agreement was entered into; but either because the parties or some of them were advised that no court had jurisdiction to validate the agreement, or for some other reason, it never was presented to

any court for approval and never became operative. It was signed by the parties, however, and the statement contained in the preamble is illuminating as to the position of the respective parties at that time upon the matter of the sale of the securities in question. After reciting the sale of the manufacturing properties to S. Slater & Sons, Incorporated, the paper proceeds as follows:

"Whereas the said manufacturing properties or the proceeds thereof whenever the securities representing the same shall be sold, will go to and be held by the said trustees as part of a residuary trust fund constituted by said will, the entire beneficial interest in which fund is vested in the four minor children of said testator of whom Mabel Hunt Slater, widow of said testator, is the guardian; and

"Whereas a controversy has arisen between the said guardian and the said executors and trustees respecting their powers and duties as regards the securities of said S. Slater & Sons, Incorporated —

"The guardian claiming that said securities cannot under present conditions be sold without serious loss to said residuary trust fund, and that for the benefit of said fund and in the interest of her wards the executors should continue to hold said securities and as directors of said corporation should continue to manage its affairs and said manufacturing properties as going concerns; and

"The executors and trustees claiming that under said will it is or may be their duty as executors to make an immediate sale of said securities with a view to their receiving and holding the proceeds thereof as trustees of the said residuary trust fund, and that such immediate sale is or may be necessary to their personal protection against possible future claims by parties beneficially interested in said residuary trust fund;

"Now, therefore, in settlement of said controversy it is agreed as follows . . . :"

It will be seen upon an inspection of this agreement in its entirety that whatever might have been the secret desire of the guardian as to the preservation of this property to the expiration of the trust, to the end that her sons or one of them could carry on the business, nothing of it appears in this paper. Her con-

tention as there expressed was not that the property should remain permanently in the fund and not be sold at all, but that it could not be sold under the then "present condition" without serious loss, which of course eventually would fall upon the trust fund; and that in the interest of her wards the executors as such should continue to manage the property as a going concern. The contention of the executors was that under the will it was their duty to make an immediate sale, so as to hold the proceeds thereof as trustees, and that such immediate sale was necessary for their personal protection against possible future claims by parties beneficially interested in the trust fund. There is nothing in all this to show any intention to modify the terms of the will as to a sale. Indeed the whole document is perfectly consistent with the view that the sale should be made in accordance with the terms of the will, that is, when it could be done without serious loss. As before stated, nothing ever resulted from this agreement, and it is alluded to and commented upon as a part of the history of the case and as tending to show the apparent and declared attitude of the parties at that time.

Meanwhile the friction between the executors and the guardian became accentuated, the situation being satisfactory to neither; and finally, in July, 1908, another compromise agreement was made, and upon a petition presented by the present plaintiffs as "executors and trustees" and signed by all parties in token of their assent, the agreement was validated in October, 1908, by a decree of the Probate Court. In view of the conflicting claims of the parties as to the nature and effect of this agreement and the decree thereon, and of their bearing on the questions before us, it becomes necessary to consider these proceedings somewhat in detail.

The petition, after reciting the appointment of the petitioners as special administrators, the incorporation of S. Slater & Sons, Incorporated, the transfer to it of the manufacturing property and the receipt from it of the securities in payment therefor, and the management of the manufacturing properties and business both before and after the foundation of the corporation, all as hereinbefore outlined, and that the trustees are the owners of all the stock of the corporation and are still managing its affairs as directors, proceeds as follows:

"3. A controversy concerning the disposition of the stock of said corporation has arisen between the petitioners and Mabel Hunt Slater, the guardian of the minor children of the testator, who, as the beneficiaries of the residuary trust fund constituted by said will, are the only parties directly and beneficially interested in said stock:

"The petitioners claiming that said stock should be immediately sold and cannot be retained by them without serious personal risk:

"And said guardian claiming that it is competent for the petitioners to continue to hold said stock and as directors with others of said corporation to manage and operate said manufacturing plants and properties for the benefit of said residuary trust fund in the manner and by the methods customarily applicable in the like cases and that the interest of her wards requires that course to be pursued.

"4. A controversy has also arisen between said Bartlett, Washburn and Smith as special administrators, executors and trustees of said estate and said guardian over the administration of the estate in the possession of said Bartlett, Washburn and Smith as special administrators, executors and trustees as aforesaid and their accounting therefor, including compensation received by them in any and all capacities under the will and otherwise and of expenditures made by them in the conduct of the manufacturing business of the testator at Webster, cotton and woollen, both before and after its incorporation:

"The petitioners claiming that their accounts as special administrators, executors and trustees beginning August 16, 1899, and ending July 17, 1908, are entitled to allowance in each and every item thereof:

"And said guardian objecting that said accounts are not entitled to allowance:

"5. A controversy has also arisen as to whether the three trustees can act in the absence of a unanimous agreement.

"6. Incidental to said controversy respecting the holding of the stock of said corporation and the operation of the manufacturing properties thereby represented, a controversy has also arisen respecting the filling of future vacancies in the board of trustees and in the board of directors of said corporation and respecting

the compensation to be received by the trustees respectively succeeding the trustees named in the will."

The petition then avers that for the settlement of the controversies an agreement which is annexed to the petition has been reached; and the prayer in substance is that the agreement may be validated by the court.

The agreement annexed, after reciting that the securities in question are held by the executors, and all the affairs of the corporation are controlled by them as directors of the corporation, proceeds as follows:

"Whereas the said manufacturing properties or the proceeds thereof whenever the securities representing the same shall be sold, will go to and be held by the said trustees as part of a residuary trust fund constituted by said will, the entire beneficial interest in which fund is vested in the four minor children of said testator, of whom Mabel Hunt Slater, widow of said testator, is the guardian; and

"Whereas a controversy has arisen between the said guardian and the said executors and trustees respecting their powers and duties as regards the securities of said S. Slater & Sons, Incorporated, the continued operation of said mills by the said executors and trustees and the other subjects-matter shown by the provisions of this agreement.

"Now therefore, in settlement of said controversy, it is agreed as follows, to wit:

"1. The executors shall transfer to themselves as trustees, all of the securities of S. Slater & Sons, Incorporated, stocks and bonds which are now held by them as executors, and thereupon their executors' accounts shall, as between all parties in interest, be considered as closed, settled and allowed."

It then provides in substance that until the further order of the court the trustees having received the securities may as shareholders perform the several duties of shareholders and cause to be elected a board of directors in the manner therein set forth, the details of which will be hereinafter more fully stated, that the "trustees, or their successors, as directors and such of said trustees, if any, as may be executive officers, may participate in the management and operation of the said manufacturing properties, and the three trustees, now acting as president, vice-president,

and treasurer of said corporation, shall continue to receive such compensation from said corporation as they have heretofore received until resignation, death, or the termination of the residuary trust and the successors of the executive officers now serving may receive such compensation as the board of directors shall from time to time determine;" that "the trustees, as stockholders, may permit the affairs of said corporation, including the making of necessary repairs, improvements and additions, to be administered in accordance with the business principles and methods applicable to the management of similar manufacturing corporations;" and that the trustees, "so long as they shall hold a control of the stock, may permit said business to be conducted for the benefit and at the risk of said residuary trust fund, as and to the extent as hereinafter set forth, and any dividends paid to said trustees as holders of said stock, shall thereafter cease to be available for use in the business of said corporation and shall form a part of said permanent residuary trust fund; provided, however, that all expenditures for operation, maintenance, betterment of the plant or additions thereto, shall be made from the funds and upon the credit of S. Slater & Sons, Incorporated, and in no circumstances shall affect or involve the remainder of said residuary trust fund."

It then provides in substance that all of the past acts of the present trustees, in whatever capacity done as representing the estate or as officers of the corporation "including the compensation received by them in all capacities under the will or otherwise," are ratified and approved, and all their accounts up to date including their accounts as trustees of another fund in which Mrs. Slater had a life interest are to be considered as allowed by the Probate Court.

After making some provision with reference to other trusts under the will not here material, and providing that in the event of a disagreement among the trustees in regard to any matter within their control the majority shall control subject to the right of the minority to apply to the court for instructions, the agreement ends as follows:

"9. The executors and trustees, or any of them, the guardian of said minor children, or any other party or parties in interest, may at any time apply to said Probate Court or any other court

having jurisdiction, for an order and decree for the sale of said securities of S. Slater & Sons, Incorporated, or for such other order and decree respecting said manufacturing business, or the dissolution of the corporation, as the facts may warrant."

The proceedings by which this agreement was validated took place under St. 1907, c. 447. Whether this statute was rightly interpreted by the Probate Court is not now before us. The court had jurisdiction of the cause and of the parties and was called upon to construe the statute, and its decision, there having been no appeal therefrom, whether right or wrong, must be regarded as the law of the case. Indeed the plaintiffs do not contend to the contrary.

What is the true meaning of the agreement and what is the legal effect of the decree? It is well to look into the circumstances under which the agreement was made. The will prescribed what should be done with this property enlisted in the cotton industry. The executors were to carry on the business only for the purpose of winding it up, "so long as they find it advisable so to do, to close it up without serious loss." Notwithstanding this express direction the executors as such had been carrying on the business for nearly six years; and this they had done under the weight of serious financial responsibility. If called to account for holding the property so many years they might find difficulty in justifying themselves on the theory that during all that period there never had been a time when the property could have been sold without serious loss. The property was not of a peculiar kind. The mills were in good condition and the profits were large. The proposition that such property under such circumstances could not have been sold during that time for a fair price is one not easily accepted, and in any event not capable of very satisfactory proof. And that is so even if, as contended by the defendants, there was in addition to the value of the physical property a value arising out of the good will. Moreover, for every act done in carrying on this business the plaintiffs were answerable as executors; and they knew not whether or to what extent their acts involving millions of dollars might be challenged as unwise or inconsistent with their official duties. It was an unnatural and somewhat perilous position for them. The guardian on the other hand had come finally to feel that the business, if possible, should

not be sold, but that it was competent for the plaintiffs still to hold the stock and as directors in company with others of the corporation to carry on the business for the benefit of the trust even to its expiration. She was disputing the amount of their claim for compensation and she could if she chose contest the account of the executors as to expenditures and generally as to their stewardship. During all these years there had been more or less friction. The situation had been unsatisfactory to both parties, and during the period attempts to sell and attempts at compromise had been made, but all to no avail. After this history and under these circumstances the compromise was made and approved by the court.

It is to be noted that upon the face of it there is a great difference in the manner in which the various matters in dispute are treated. The most of them were finally settled and no further action was to be had concerning them. For instance, the transfer from the executors to the trustees was to be final. All acts of the petitioners were ratified and their accounts including the matter of compensation were finally settled. As to these various things nothing more was to be done.

But as to the securities in question and the manufacturing business, the agreement provides for further action at the request of either party. The guardian desired that the property should be kept by the trustees and the manufacturing business carried on "in the manner and by the methods customarily applicable in the like cases;" and it is stated in substance by her counsel in the argument before us that her purpose was to have this property kept to the expiration of the trust in order that the business which had been for years in the Slater family should be carried on by her sons. The plaintiffs desired that it should be immediately sold. The agreement neither provided that the property should be immediately sold, as the plaintiffs contended ought to have been done, nor that it should be kept and the business carried on until the end of the trust in the manner in which such business usually is carried on, as the guardian desired; nor did it attempt to settle finally the question what should be done with the property. As to this the agreement on its face was provisional only. While a method is provided by which the business may be carried on so long as the property is held by the trustees,

it is nowhere expressly stated how long it shall be so held. If it had been the intention of the parties that it should be held in any event until the expiration of the trust, there can be no doubt that under the circumstances this intention would have been expressed in the agreement. Clearly the time during which the property should be held was subject to a contingency. All parties recognize this. They differ only as to the nature of the contingency.

At the hearing before the single justice the plaintiffs contended that so far as these securities were concerned the agreement furnished merely a *modus vivendi* until they could be sold without serious loss, and that the direction of the will to sell still continued. On the contrary the guardian contended that the true construction of the agreement was that the testamentary direction to sell was nullified and that the trustees were to hold the securities as a part of the trust fund unless meanwhile there should be a material change in the situation indicating that they should be no longer held.

It is well to consider the anomalous situation to which such a construction would lead. Before these proceedings the securities never had been a part of the trust fund but had been held by the executors not for the purpose of carrying on the business indefinitely as a matter of investment, but only for winding it up without serious loss. After the proceedings, as the guardian contends, the trustees as such are to hold the securities as a part of the trust investment to the expiration of the trust in July, 1920, a period of twelve years from the time of the execution of the agreement, an investment utterly inconsistent with the directions of the will as to the kind of property of which the trust fund should be composed.

Moreover, while holding the property as trustees they are to be relieved from the liability imposed by the general rules of law upon trustees respecting the nature of investments made by them. As stockholders they are to perform the usual duties of stockholders, and as directors they are to be "subject to no further or other responsibility or liability than that imposed upon directors in similar corporations organized under the laws of [this] Commonwealth."

But in fact they as stockholders cannot perform the usual duties as stockholders. A most important duty as well as right

imposed upon or belonging to stockholders is that of electing the directors. Under this agreement that important duty cannot be performed nor that right exercised except in the most limited manner. The agreement provides how the directors shall be elected and who they shall be. There are to be at the start five, the three trustees, Mr. Olney and Mrs. Slater. As to changes the agreement provides as follows:

"Any director may resign as director. Any vacancy in the board of directors, arising from such resignation or otherwise, shall be filled in the following manner, to wit:

"In case of the declination or resignation as director and trustee, or death of either said Washburn or Smith, the successor of said Washburn or Smith so leaving office shall be a person agreeable to the remaining one of these two directors.

"In case of the resignation as director and trustee, or death of said Bartlett, the vacancy thus created shall be filled by some person to be nominated by Mabel Hunt Slater or by the guardian of her children for the time being.

"In case of the declination, resignation or death of Richard Olney, Esquire, such vacancy shall be filled by the election of such person as shall be mutually agreeable to said Washburn and Smith and Mabel Hunt Slater or the guardian of her children for the time being, and in the event of the death of Mabel Hunt Slater, the guardian for the time being shall be elected to succeed her as a member of the board of directors."

In a word, this property which under the will never was to be held by the trustees and never was to become a part of the trust fund, which is of a kind that neither by the general rules of law nor by the specific directions of the will should become a trust investment, was to become a part of this trust fund under an agreement which exempts the trustees from the general rules of the law as to liability, subjecting them only to the liability statutory or otherwise of stockholders and directors of similar corporations, and all this when by the terms of the agreement the stockholders as such have no controlling voice in the election of the directors, and when in one contingency reasonably soon to be expected, namely, the retirement of Mr. Bartlett as a director, the trustees may be in the minority and consequently unable to control the management of the business. Considered with refer-

ence to the will, the usual method of conducting the affairs of a corporation and the general rules of law with reference to trust investments, the agreement as thus construed creates an anomalous condition. Moreover the property is of the estimated value of at least six millions of dollars and constitutes more than half of the trust fund; and as contended by the guardian this anomalous situation is to continue until the expiration of the trust.

In view of the circumstances under which the agreement was made, the provisions of the will both as to the final disposition to be made of this property and the kind of property in which the fund is to be invested, as to the nature of which provisions there can be no reasonable dispute and hence no reasonable ground for controversy, of the anomalous situation as above outlined to which the construction contended for by the guardian would lead and the provision that at any time application might be made to the court for such an order for the sale of the securities as the facts may warrant, there are strong reasons for holding that the proceedings ought not to be interpreted as a final adjudication that until there should be a change in the circumstances the property should constitute a part of the trust fund even to the end of the trust, and for adopting the construction for which the plaintiffs contend.

But we do not find it necessary to adopt this construction. We are of opinion that even if as contended by the guardian the true construction of the agreement is that the property should be held by the trustees until there should be some material change in the situation looking to the contrary, still the plaintiffs have made out a case. There has been such a material change in the situation. In the first place the agreement has become unworkable. The plaintiffs so allege and the answers admit it; the single justice so finds, and the evidence justifies the finding. This of itself would warrant a court in determining that the whole question of the propriety of holding the securities should be reconsidered. But there are other material changes which of themselves are sufficient to justify if they do not require the sale of these securities. The demand for woollens has fallen off one half since 1908; the profits of the business are subject to great fluctuations; the years during which the business was carried on up to 1908 were years of prosperity; there was a loss in 1908, although

in 1909 there was a large profit.   Before 1908 there had been no necessity of borrowing money, but since then it has been necessary to borrow large sums of money.   The amount of capital needed for the business is constantly increasing, and it now has become necessary to invest large sums of new capital, estimated at two millions of dollars, for replacement and extension of the plant in the next few years.

If it be said that there are great changes in every kind of business, especially in manufacturing business, great profits being made some years and corresponding losses in other years, that in a business like this it is generally necessary to lay out large sums in keeping up the plants, that all these changes are necessary and that no business man would think of selling out or discontinuing his business on account of such changes, that the manufacture of cotton and woollen goods is a staple business and notwithstanding changes and reverses must in the long run be remunerative under proper management, no matter what may be the changes effected in the general situation by tariff laws or other causes, the answer is plain.

We are not dealing with the ordinary business, nor with the property, of a business man.   We are dealing with an investor, and that investor not in his individual capacity but as a trustee. Nowhere in the agreement or in the decree does it appear expressly, nor, in our opinion, by fair implication, that the trustees were thereafter to hold the property under the same conditions as to the propriety of selling as are applicable in the case of a business man acting solely for himself.   All along the trustees continue to be trustees and the property continues to be trust property. Neither as trustees nor individuals can they be expected to indorse paper or otherwise make themselves personally liable for money borrowed for the corporation, or for sums to be expended in the renovation or extension of the plant.   It is obvious that these several changes in the situation, however trivial or usual they might seem to the individual manufacturer working on his own account and answerable to no one but himself and therefore free to take any risk he might choose, are of material consequence in the situation of these trustees charged with official responsibilities and answerable to the beneficiaries for their stewardship.   The changes affect the burden of their labors and may increase their

responsibilities, and call for a line of procedure into which as trustees they should not enter.

In considering this case we must not lose sight of the fact that the testator never desired nor intended that this property should be a part of the trust fund, but on the contrary expressly directed that it should not be; that he was thoroughly acquainted with the nature of the business, the liability to lose as well as the chance for profit, and the skill required in its management, that the considerations urged by the guardian why the property should remain in the trust do not appear to be founded so much upon financial principles as upon her belief that if the business can be held for her sons or one of them it will be better for them to have it as an incentive to honorable employment than to have no such incentive, that it is not at all certain that either son will have the capacity to carry on the business successfully, that there are four beneficiaries, of whom two are girls with respect to whom there is no such reason why the property should be kept, that to carry on the business is totally inconsistent with the general principles of law as to trust investments, and that the securities comprise more than one half in value of the fund.

Viewed in this light it is not to be supposed that the decree of the Probate Court is to be construed as meaning that the property should be held by the trustees and the business should be carried on in the manner described in the agreement until there should be such changes in the situation as would seem to a business man sufficient reason to sell out or discontinue. On the contrary the change at least need be no other than would tend to increase the unfitness of the property for trust investment and the impropriety of carrying on the business as such. Measured by such a standard it is seen that upon the findings of the single justice, all of which are warranted by the evidence, the changes in the situation are not only material but they indicate with reasonable certainty that the property, or at least a part of it, should be sold.

2. During the trial several motions were made by the defendants and some questions arose concerning the admission of evidence. "So far as [they] are material to said decree" they are reported by the single justice.

The motion to strike out the admission in the answer that the

compromise agreement of 1908 was unworkable was rightly denied within the discretion of the court. Upon the whole record we think, for reasons therein stated by the single justice, that the discretion was wisely exercised. Moreover the defendants were not harmed by the denial of the motion.

While the petition for the removal of the trustees might have been heard with this bill, yet it was not so closely allied to the real question whether the securities should be sold and the business wound up as to make such action essential for purposes of justice. We cannot say that in declining to hear that case in connection with the present case the justice wrongly exercised his discretion.

During the trial the single justice thought that the main question was whether the securities should be kept. To this general attitude of the court the counsel for the defendants objected and many times attempted to introduce evidence, some of which he contended was admissible even upon the narrow issue stated by the court, and some upon a broader issue. Much of this evidence was excluded. It is unnecessary to go into details. Upon a careful inspection of the record we do not see that the defendants have any reasonable ground of complaint.

3. The remaining questions respect the nature and form of the decree. Was it a final or an interlocutory decree? It is styled a final decree in the record. It appears to have been entered as such, and the appeal is not from an order for the decree but from the decree itself, and the justice who made it thought it was a final decree. Whatever may be the rule elsewhere, according to our equity practice, which is regulated largely by statute, there can be no report of a case upon an appeal from a final decree which has been formally entered. The appeal from such a decree may come to this court as such with or without a report by the justice who made the decree, not of the case but only of the material facts found by him, but in no other way. Where, however, there has been only an order for a final decree and the decree has not been formally entered, the order may be regarded as in the nature of an interlocutory decree and the questions arising thereon may be brought here by report, as in the case of any other interlocutory decree. If this was a final decree it could not come here by report.

"No decree is a final one, which leaves anything open to be

decided by the court, and does not determine the whole case." Gray, C. J., in *Forbes* v. *Tuckerman,* 115 Mass. 115, 119. Measured by this test this was not a final decree. It provided for further action on the part of the court, namely, that the "terms of such sale and the adequacy of such price shall be submitted and subject to the approval of a single justice of this court." * As an interlocutory decree it is properly before us. R. L. c. 159, §§ 23, 27.

The motion that the decree be restricted to the order of sale of the securities † was rightly denied. No trustee should be personally interested in the sale, it is true, but whatever may be said of any past agreement for sale the presiding justice found as a fact that none of the trustees had such personal interest in any of the negotiations for or proposed sale of the securities as disqualified him from acting loyally and to the best of his ability for the trust in making the sale. He declined to consider the charges against the general ability or inclination of the trustees to act as trustees ought to act in such a matter. While he confined the inquiry to rather a narrow scope, yet in view of the situation at the time the motion was made and the further fact that any sale made by the trustees must be subjected to the approval of the court, we see no reason to declare his discretion wrongly exercised in denying the motion.

The plaintiffs' motion that a paragraph be inserted in the decree "to the effect, in substance, that the price at which the securities should be sold should be determined finally and without right of appeal by any party by decree of a single justice" was rightly

---

* The portion of the decree referred to was as follows:

"Second. That the trustees proceed to negotiate at a fair price a sale of said securities or such proportion of them as will reduce the amount held by the trustees to such comparatively small amount as would be a reasonable investment of trust funds under the terms of said will; and that the terms of such sale and the adequacy of such price shall be submitted and subject to the approval of a single justice of this court."

† The motion also prayed "that no decree be entered authorizing the trustees to conduct the negotiations or accomplish the sale, until full inquiry and investigation shall have been made as to the capacity and fidelity of the trustees in the discharge of their duties or the personal interest of them, or any one of them, in the proposed sale, antagonistic to the interests of the trust."

denied. However desirable such a provision might be in the interest of the parties, both trustees and defendants, it cannot be inserted. Whatever jurisdiction the single justice has over this matter he has it as a justice of this court, and by statute any party aggrieved by any order or decree in equity, whether interlocutory or final, made by a single justice, may appeal to the full court. R. L. c. 159, §§ 19, 25.

There must be, therefore, a decree for the sale of at least some portion of the property; and the question remains as to what is the most practical and sensible form the decree should take. It is not to be assumed that the property cannot be sold at a fair price. It is a "going concern" and not peculiar in character. The business is of long standing and appears to have a good name. There would seem to be no good reason why individual capital seeking an investment should not be attracted to it. It is, however, a large concern, and for that reason it may not be easy to find purchasers at once. And there may be an honest difference of opinion among those who propose to sell and those who think of buying as to what is a fair price.

The sale should be made irrespective of the personality of the trustees, — should be made by the trustees for the time being. It does not seem necessary that all the securities should be sold. We think, however, that the stock both common and preferred should be sold. The bonds, although amounting to a large sum, are apparently amply secured and need not be sold now.

For these and other reasons which need not be set forth in detail, the majority of the court are of opinion that the decree made by the single justice should be modified according to the order accompanying this opinion.

*Decree for the plaintiffs.*

Note. The order above referred to was as follows:

"First: That the securities and obligations of S. Slater & Sons, Incorporated, a Massachusetts corporation owning a manufacturing property, now held by the trustees, or, at the discretion of the trustees, only the stock, common and preferred, of said corporation so held by them, be sold, such sale to be negotiated by the trustees for the time being.

"Second: That the trustees proceed to negotiate at a fair price a sale of said securities, or at their discretion, only the said stock, and that the terms of such sale and the adequacy of such price shall be submitted and subject to the approval of a justice of this court, provided, however, that no such

sale shall be so approved if the guardian for the time being shall file in court her written objection to its terms.

"Third: That if on or before the first day of January in the year nineteen hundred and thirteen no valid and final sale of said stock shall have been made and approved under the second clause of this decree, then on or before the first day of April in the same year the securities, or at the discretion of the trustees only the stock, shall be sold at public auction to the highest bidder, the upset price and the other terms to be settled by a single justice."

Morton, J.  I regret that I am unable to agree with the opinion. But I do not think (first) that a sale should be ordered, and I do not think (secondly) that if there is to be a sale the present trustees should be authorized, as the case stands, to make it.

I take up the second objection first.  When the case came on for hearing the defendants filed a petition for the removal of the trustees, alleging amongst other things as grounds of removal unfaithfulness and incompetence, and moved that the petition be heard with the bill of the trustees for instructions.  This motion was denied and the case proceeded to a final hearing on the bill filed by the trustees.  The petition for removal is still pending and has not been passed upon.  The presiding justice, now the Chief Justice, filed a memorandum of decision directing that a decree should be entered ordering a sale of a part of the securities by the trustees.  After the filing of the memorandum of decision and before the entry of a decree the defendants filed a motion or petition that the decree when entered be limited to a sale of the securities, averring that the trustees were unsuitable persons to have charge of the sale, and alleging amongst other things that one of them, Smith, had a personal interest in the sale of the securities.  A hearing was had upon this motion or petition. At the hearing the presiding justice restricted the evidence to the question whether any of the trustees had such personal interest in the proposed sale of the securities as to disqualify them, and limited the time to be covered by such inquiry to a period between April 10, 1910, and the date of the hearing, which was on February 10, 1911.  It appeared during the hearing on the bill for instructions that one of the trustees was totally incapacitated from attending to his duties as trustee, and that the time of another had been so taken up by public duties during the last two years that he had been able to give little or no attention to the affairs of the

trust. It also appeared, or there was evidence warranting a finding, that the other trustee, Smith, had been engaged on one, if not two, occasions in negotiations with Kidder, Peabody and Company for a sale of the manufacturing business and property to a new corporation to be organized by them, in which he was to be financially interested and of which he was to be the manager at a salary of $25,000 a year. These negotiations fell through on account of the opposition of Mrs. Slater. It did not appear that she knew at the time of Smith's personal interest in them. There was also testimony tending to show that Smith had proposed to Mrs. Slater that he should be put in as general manager of the manufacturing business and property, at a salary of $25,000 a year, and that she declined to agree to the proposition, and that after that he again took up negotiations with Kidder, Peabody and Company for a sale of the property. It would not be an altogether unwarrantable inference that if Mrs. Slater had agreed to the proposition made by Smith this bill for instructions never would have been heard of. The presiding justice found that none of the trustees had any such interest in the proposed sale as to disqualify them, and a decree was entered as already observed directing the trustees to sell a part of the securities. The majority opinion affirms the decree with some modifications. The result will be, if the decree stands, that the sale will be put into the hands of persons of whom one is totally incompetent to act, another has given no attention to the manufacturing business for two years, and the third has heretofore been engaged in negotiations for a sale of the property in which he was to have a pecuniary interest. The decree will also have been entered while a petition for the removal of the trustees is pending, which the defendants have tried without success to have heard. Without imputing any want of probity to any one, it seems to me that the mere statement of the situation is enough to show that if a sale is to be made these trustees ought not to be the ones to make it. The provision in the decree that a sale may be made with the consent of the guardian does not materially change the situation. The defendants are entitled to have the affairs of the trust administered by three trustees all competent and faithful. They are entitled to have the sale, if there is to be a sale, conducted by such trustees. The finding that none of the trustees is disqualified by

reason of personal interest in the sale which is now proposed is far from settling the question whether the sale should be committed to them.   I think that the petition for removal should have been heard in conjunction with the bill for instructions by the trustees, or that action on that bill should have been postponed until the petition for removal had been heard and passed upon.   I also think that if the petition in regard to limiting the decree was to be heard at all, the defendants should not have been restricted as they were either in respect to the issue to be tried or the time to be covered by the evidence, but should have been allowed to go into all matters affecting the competency and faithfulness of the trustees, subject only to those general rules by which courts in the exercise of their discretion regulate the conduct of trials. Where matters affecting the competency and faithfulness and suitability of trustees are involved, the scope of the inquiry should not be narrowed, but every opportunity consistent with the rules of law should be allowed to investigate the charges that are made.

I pass to the merits, strictly so called, namely, whether a sale should be ordered, though the matters to which I already have referred seem to me materially to affect the defendants' rights.

The property in the hands of the trustees, including the three millions of which the widow has the income for life, amounts to upwards of fourteen millions of dollars.   This is all to be divided ultimately among the four children.   Upwards of eleven millions of dollars of this is held by the plaintiffs upon a trust which will end July 12, 1920, and which has therefore only a little more than eight years to run.   The oldest child is upwards of eighteen years of age, or was at the date of the hearing on the bill.   The next, a boy, was between seventeen and eighteen years of age, and the other two were fifteen and twelve years of age respectively.   The securities which are the subject of the bill represent the cotton and woollen manufacturing business with its accumulations since Mr. Slater's death, in which Mr. Slater was engaged when he died, and which had been in the Slater family for a hundred years. The business was carried on by Mr. Slater with great success, and it has been carried on with great success by the trustees during the eleven or twelve years that they have carried it on since Mr. Slater's death.   The trustees have expended out of the

profits of the business large sums in keeping up the property and adding to it, and everybody agrees that the manufacturing properties are now in a much better condition than when Mr. Slater died. Large sums, it is said, will have to be spent in the near future for improvements and additions. But the undisputed testimony shows that the expenditures when made will add proportionately to the value of the property and will yield a satisfactory return and will put the property in shape to compete successfully with other concerns. If it should be necessary to borrow there is not a scintilla of evidence to show that there will be the slightest trouble or risk in borrowing on the credit of the corporation all that may be needed. The trustees have borrowed large sums and repaid them without difficulty. The guardian, who is the widow, and the children, who, as I have said, are the parties amongst whom the property is ultimately to be divided, are strongly opposed to the sale. The eldest son, who will soon be of age, is anxious to take up and carry on the business which his father and others of the family before him have carried on. The proposed sale will prevent him from doing so, or at least will have the effect of taking away to a large extent the inducement to do so, since it will operate to transfer the business to other hands and will put an end to the control of the Slater family over it. Reduced to its last analysis the reason for ordering a sale of a part or all of the securities is that if the trustees keep them and continue to carry on the business the estate may suffer a loss. It would seem that if, with an estate of upwards of fourteen millions of dollars to be finally divided amongst them, the beneficiaries, because of family pride or because they believe that the investment is a good one, desire that the securities should be kept and the business carried on as it has been, their wishes should be respected. They can amply afford any loss which they may sustain. No rule of law requires that the securities should be sold and the business disposed of. The case is not one for the application of the rules of law relating to the investment of trust estates. The effect of the decree of the Probate Court confirming the compromise agreement of 1908 was to authorize the investment in these securities. The will was modified by that agreement and the terms of the trust were thenceforward to be found in the will as modified by the agreement. The decree of the Probate

Court was not appealed from and full force and effect must be given to it. It is not attempted to raise a question respecting its validity. It is too late to raise any such question. Even if it were not, its validity cannot, it seems to me, be successfully attacked. By means of the compromise agreement the trustees procured a full and final settlement of their probate accounts and became entitled thereby to retain sums which they had charged for their services during the three years when it turned out that they were in fact acting as administrators with the will annexed, though everybody interested supposed they were acting as executors and that the will had been duly proved and allowed, which sums so charged trebled in amount the compensation given them as executors in the will. Justice and fair dealing require that the plaintiffs should be held to the agreement of 1908, and should be compelled to carry it out in good faith. That agreement was intended as a final settlement of all differences between the parties. It was also intended to provide for carrying on the business permanently. That appears upon the face of the agreement itself. In addition there was evidence of statements by Smith and Washburn to that effect. Bartlett, the other trustee, was unable to testify. Leave was reserved in the concluding clause to any of the parties to apply to the court for a sale of the securities as the facts warranted it. There are no facts, in my opinion, which warrant this application for a sale of the securities. Nothing has occurred since the agreement was entered into which was not reasonably to be anticipated, or which must not be deemed to have been within the contemplation of the parties when they entered into the agreement. Any other conclusion would attribute to the trustees a shortsightedness which in view of their experience and ability would be preposterous. The uncertainties attending the business will be no greater in the future than they have been in the past. It is said that the scheme contained in the agreement for carrying on the business has become unworkable and the presiding justice so found, relying in part at least upon an alleged admission in the answer to that effect after he had refused the defendants leave to amend, which, it seems to me they ought to have been allowed to do, though I agree that the matter was within his discretion. I think that the presiding justice and the majority of the court construe the alleged admission much too

broadly. What the answer says is this: "These respondents admit the allegations contained in the fourteenth paragraph [which is the paragraph that alleges that the plan has become unworkable] . . . and insist that the reason that the compromise agreement of 1908 has become unworkable is due entirely to the fault of the petitioning trustees and to their failure to keep the promises to the testamentary guardian . . . which were the basis of and inducement for the execution of said agreement." The fair construction and implication of this is, it seems to me, not that the scheme contained in the agreement can no longer be carried out, but that it has become unworkable because the trustees have not done what they ought to do and that if they do what they ought to do there will be no difficulty. No one can contend that in and of itself the scheme for carrying on the business is not workable. There has been no such change in manufacturing conditions generally or at the mills operated by the plaintiffs as to render it impossible to carry out the scheme as it was intended to carry it out. Nothing, it seems to me, but the most cogent reasons and the most insuperable objections can justify the court in declaring that an agreement deliberately entered into as this was, for the purpose of settling all differences and providing a method for continuing the business, and which has been approved by the Probate Court and now constitutes a part of the terms of the trust, is no longer binding and workable. The fact that there has been friction between the guardian and trustees is no reason for pronouncing the agreement unworkable and ordering a sale of the securities. If all of the trustees had been in a condition to attend to the business of the trust and had done so, it is possible that there would have been no friction or that it would have been reduced to a minimum. As it is, the active management of the manufacturing business has devolved practically upon one trustee. Under such circumstances it is unjust, it seems to me, to pronounce the agreement unworkable.

As I have said, the investment of the trust estate in these securities was in effect approved by the decree of the Probate Court confirming the compromise agreement. Whether the securities, or a part of them, shall be sold does not depend therefore on whether they are a proper investment for trust funds. The parties have agreed, notwithstanding the will, to the investment,

and the agreement has received judicial sanction. Neither does the question of risk to the trustees arising from a continuance of the investment and the carrying on of the business enter into the matter at all. The agreement contemplates that the business shall be carried on and expressly provides that the liability of the trustees shall be only that of directors in manufacturing corporations, thus relieving them from liability as trustees.

The will authorized the executors to carry on the manufacturing business until it could be wound up without serious loss, and gave directions for the investment of the proceeds. Purporting to act under and by virtue of the authority thus given, the parties named as executors carried on the business till 1903, when pursuant to a decree of the Probate Court they caused a corporation to be formed of which they elected themselves directors and to which they conveyed the manufacturing property and business, receiving therefor the securities in question. This was done without objection from the beneficiaries. Since 1903 the business has been carried on by the executors and trustees as directors of the corporation thus formed. It may well be doubted whether there was any warrant in law or authority in the will for what has thus been done. This was the situation when the compromise agreement of 1908 was entered into. The effect of that was to modify the will and to create a status which was to continue indefinitely, though not longer of course than the trust, subject only to the proviso that any of the parties might apply to the court at any time, as the facts warranted, for a sale of the securities. The fair construction of this is that the status established by the agreement is to continue until it is apparent that by reason of changes in family, business or other matters affecting the estate or the beneficiaries which have occurred since the agreement was entered into, it is no longer for the best interests of all concerned that the business should be continued as provided. It should clearly appear that the best interests of all concerned require a sale in order to warrant one. It is not sufficient that there may be some hazard in continuing the business, or that the investment is one that ordinarily would not be sanctioned. Those questions, as I have said, are foreclosed by the agreement and its approval by the Probate Court. The question is not whether this is a proper investment for trust funds as the presiding justice in effect ruled,

but whether there have been such changes since 1908 as, taking all the circumstances into account, require a sale of these securities and the giving up of the business. In passing upon that question not only is the financial aspect to be considered, but regard is to be paid to laudable family pride and honorable ambitions on the part of the beneficiaries and the widow and guardian, and to what will tend to promote the mental and moral welfare of those for whose benefit the plaintiffs hold this estate. Their support and maintenance in a style befitting their fortunes is abundantly secured. The size of the estate is also to be taken into account, and what might not be proper in a small estate may well be deemed unobjectionable in an estate of the magnitude of this. Giving to these and other considerations which should be taken into account the weight to which they are justly entitled, it does not seem to me that a case for a sale has been made out. No case has been cited, and I think that none can be found or it would have been cited, in which a sale has been ordered against the objection of the beneficiaries where the circumstances at all resembled those in this case. Indeed, I am not aware of any case in which a change of an investment permitted by the terms of the trust has been ordered against the objection of those ultimately entitled to the trust estate, nor in which a finding in favor of a sale has been based, as here, largely on the testimony of trustees whose competency and faithfulness are in dispute and still undetermined.

Mr. Justice Braley concurs in this opinion.

The case was argued at the bar in March, 1911, before *Knowlton,* C. J., *Morton, Hammond, Braley, & Rugg,* JJ., and afterwards was submitted on briefs to all the justices then constituting the court.

*J. R. Thayer & S. L. Whipple,* (*A. Lincoln* with them,) for the defendants.

*H. Parker & T. H. Gage,* for the plaintiffs.